IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BP PRODUCTS NORTH AMERICA, INC. | § § § | |
| | § | CIVIL ACTION NO. H-03-5218 |
| VS. | § § | |
| INTERNATIONAL MAINTENANCE CORPORATION | § § § | |

**MEMORANDUM IN SUPPORT OF
INTERNATIONAL MAINTENANCE CORPORATION'S
MOTION TO EXCLUDE EXPERT TESTIMONY
AND REPORT OF DOMENICK COSTAGLIOLA
AS IT RELATES TO HIS OPINION C.1**

**(SUBMISSION OF TIMESHEETS)**

International Maintenance Corporation ("IMC") submits this memorandum in support of its Motion to Exclude seeking to exclude the expert testimony and report of Domenick Costagliola as it relates to his Opinion C.1 that "IMC did not timely submit time sheets in accordance with the Refinery Contract requirements" as follows:

**I. SUMMARY OF ARGUMENT**

Pursuant to Federal Rule of Evidence 702, Mr. Costagliola is unqualified to offer this opinion under the tests set forth by the United States Supreme Court in <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999) and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

1

## II.     MR. COSTAGLIOLA'S OPINION C.1

In the Costagliola Report, Mr. Costagliola offers the opinion that BP should be excused from payment of $1,858,884 of the outstanding IMC invoice amount[1] based upon "timesheets [having been] submitted more than one day after work was performed." (Costagliola Report, p.14-17, Motion **M. Exh. "1"**). That opinion is reiterated in the Costagliola Rebuttal. (Costagliola Rebuttal, pp. 1-3, Motion **M. Exh. "2"**). In addition, Mr. Costagliola testified about his opinion in his deposition:

> Q.   [MR. SORRELS] …in your analysis of damages it looks like you've concluded $1,858,884 of payments were excused by BP. Is that right?
>
> A.   Yes.
>
> Q.   Why are they excused?
>
> A.   Payment excused category means that BP has not yet paid that amount, and their excuse is because there's noncompliance with the contract.
>
> Q.   Any other reason?
>
> A.   No.

(Costagliola Depo., p. 54; Motion **M. Exh. "3"**).

This opinion is based upon Mr. Costagliola's **legal interpretation** that IMC did not comply with the contract, specifically, timesheet submission provisions section set forth in the "Short Form [Refinery] Contract dated 1/18/2001." (Refinery Contract, Motion **M. Exh. "4"**).

---

[1] The outstanding invoice amount is $2,859,556.42. (*See* IMC Open Invoice Report - Due from BP, Bates Nos. IMC 70746-49, attached to the accompanying Motion as **Exh. "A"**). Although, IMC worked under contract at the BP Texas City Refinery and Chemical Plant for almost three years, from January 2001 until November 2003, the vast majority of the unpaid invoices are from the calendar year 2003, and, in fact, virtually all of the labor invoices involve labor worked from late June to November 2003.

2

**Mr. Costagliola is not a lawyer, and he certainly is not a judge!** The specific provisions relied upon by Mr. Costagliola are included in three paragraphs found on pages 4 and 5 of the Refinery Contract. (Costagliola Rebuttal, p. 2, Motion **M. Exh. "2"**). For ease of reference, these three paragraphs will be referred to in this memorandum immediately below, as well as throughout, as *Paragraphs One, Two*, and *Three*:

> [*Paragraph One:*]
>
> "PRICE AND TERMS OF PAYMENT:
>
> Time and materials per Contractors craft schedule 9700 and equipment schedule 9400. Contractor shall report his labor on separate **Company time sheets** per Schedule 9700. Contractor shall report his equipment on **Company time sheets** per schedule 9400. Company to accrue taxes under Direct Pay Permit #1-36-Z440313-8. Contractor to consider his labor non-taxable per the Texas Tax Code."

(Emphasis added).

> "INVOICING PROCEDURES:
>
> [*Paragraph Two:*]
>
> Contractor shall submit **daily time sheets** to Company's Job Representatives for verification and signature and shall include a copy of **signed time sheets**, as well as material back-ups, with his invoice.

(Emphasis added).

> [*Paragraph Three:*]
>
> The contractor will be responsible for reporting and submitting **timesheets** for Company approval before the close of the next work day after work has been performed. Company reserves the right to delay or refuse payment on any timesheets that have been submitted after the close of the next work day."

(Emphasis added) (Refinery Contract, Motion **M. Exh. "4"**).

The specific timesheet provision that Mr. Costagliola contends excuses BP from payment

3

is the provision in *Paragraph Three* which reads that "[t]he contractor will be responsible for reporting and submitting timesheets for Company approval before the close of the next work day after work has been performed." According to Mr. Costagliola's interpretation of the Refinery Contract, "IMC submitted 90% of their timesheets over the course of the project more than one day late." (Costagliola Report, p. 15, Motion **M. Exh. "1"**).

Mr. Costagliola concluded (without any support other than his subjective opinion) that the terms **"Company time sheets"** in *Paragraph One*, **"daily time sheets"** in *Paragraph Two* and **"timesheets"** in *Paragraph Three* all mean exactly the same thing, namely a **"BP Atrack timesheet."** He reached this conclusion even though *Paragraphs One* and *Two* contain the two word term "time sheets," as opposed to the one word term "timesheets" contained in *Paragraph Three*, and even though the term "time sheets" in *Paragraph One* is preceded by the word "Company," (denoting BP) which is not the case in *Paragraphs Two* or *Three*. Mr. Costagliola also completely disregarded the fact that a separate timesheet format was in regular daily use by IMC at the BP plants from 2001 through 2003. IMC completed timesheets (entitled "Time Card") by hand each day and submitted these "**timesheets**" for BP approval before the close of the next workday after work had been performed (as required by *Paragraph Three*). Finally, Mr. Costagliola's opinion is contradicted by the Texas City Contractor Invoicing Process detailed by BP's internal auditor Lisa Donnelly.

Mr. Costagliola's opinion constitutes a legal interpretation of the meaning of phrases and terms of the contract, which is totally impermissible as expert testimony under the principles of <u>Kumho Tire</u> and <u>Daubert</u>, and should be excluded in this case.

4

### III. BACKGROUND

**A.   THE BP/IMC CONTRACTS**

On January 18, 2001, IMC entered into a contract with BP Amoco Refinery, Texas City Business Unit for IMC to perform refinery tank maintenance at BP's refinery located in Texas City, Texas. (Refinery Contract, Motion **M. Exh. "4"**).

In March of 2001, IMC entered into the first of a series of purchase orders with BP for IMC to perform chemical plant tank maintenance at the same location ("Chemical Contract"). In August of 2002, the parties entered into a Contract for BP's Benzene Emissions Reduction Tank Modification Project ("Dome Contract"). The Chemical and the Dome Contracts are not attached because they are not relevant to this Motion, as will be clear from Mr. Costagliola's deposition testimony cited later.

**B.   IMC'S TANK WORK PURSUANT TO THE CONTRACTS**

IMC performed tank maintenance on large cylindrical tanks used for storing crude oil and the various products produced at the BP plants. BP was obligated to pay IMC for each hour of work performed by an IMC employee.

The BP Tank Maintenance Turn-Around Coordinator responsible for assigning work to IMC was Mr. Howard Luster. Mr. Luster, or a BP job representative working for him, provided detailed job scopes which set forth the work IMC was to perform. Mr. Luster testified that IMC's work was being followed by the BP job representatives as the work was done. (Luster Depo., pp. 12, 99-100, Motion **Exh. "B"**). He also testified that he had absolutely no criticisms of IMC's tank work throughout 2001 and 2002. (Luster Depo, pp. 31-32, Motion **Exh. "B"**).

### C.   THE IMC AND ATRACK TIMESHEETS

Each day, IMC's timekeeper obtained a sign-in sheet from each work crew's foreman showing time worked by the employees. The timekeeper transferred this information on to an IMC Time Card, an example of which is attached to the Motion as **Exh. "C"** ("IMC timesheet"). IMC timesheets were submitted to a BP job representative on a daily basis. An IMC employee would drop the IMC timesheets in the various BP job representatives' in-boxes. In most cases the IMC timesheets were submitted no later than the end of the next day after the work was performed. BP often returned the IMC timesheets signed. However, in many cases the IMC timesheets were not signed. The various BP job representatives were aware of which IMC employees were working on their jobs because they visited their tank jobs each day and reviewed the IMC timesheets that were submitted on a daily basis.

After IMC submitted the IMC timesheets to the BP job representative for approval, IMC was expected to input the timesheet information into BP's own computer system, known as Atrack. IMC regularly put the timesheet information into Atrack. BP's Atrack system generated a document entitled "BP Daily Time Report," an example of which is attached as **Exh. "D"** ("Atrack timesheet"). IMC submitted the Atrack timesheets to the BP job representatives to obtain their signatures. The Atrack timesheets were included by IMC's staff as back up to the Atrack invoices sent to Accenture, the contractor which handled payment of contractor invoices for BP.

### D.   BP'S INVOICE PROCESS FLOW CHART RECOGNIZES THE USE OF THE IMC TIMESHEETS AND THE ATRACK TIMESHEETS

IMC initially performed timesheet data entry into the Atrack system at IMC's Beaumont

6

office. In March of 2002 data entry into the Atrack system began to take place at the BP facility. Because of confusion in the issuance and payment of some invoices in 2002 BP decided to conduct an audit of all of the IMC invoices to ensure that no erroneous payments had been made. In connection with the audit, which began in the fall of 2002, BP's home office auditor, Ms. Lisa Donnelly, went to BP's Texas City plant as well as IMC's Beaumont, Texas office in January of 2003. She interviewed both BP and IMC employees about invoice and timekeeping issues. IMC cooperated with Ms. Donnelly and provided her with all the records she requested. Ms. Donnelly did not find any duplicate payments of invoices, but her final audit report did note administrative deficiencies with both BP and IMC.

As part of Ms. Donnelly's audit and final report, she analyzed and reported on the contractor invoicing process. She generated flow charts, which were provided to BP's Texas City management in March 2003. These flow charts recognized that both the "IMC timesheets" and the "Atrack timesheets" were being used in the invoicing process. (Ms. Donnelly's email dated 03/11/03, attaching Final Audit Report and Invoice Process Flow Charts, attached to the accompanying Motion as **Exh. "E"**; Audit Summary with print-date 03/10/03, attached to the accompanying Motion as **Exh. "F"**; and Texas City Contractor Invoicing Process, attached to the accompanying Motion as **Exh. "G"**).

The Texas City Contractor Invoicing Process shows that the invoicing process is divided into various steps. The steps are:

1. Work performed by contractors;
2. Timesheets approved by BP/FGS job rep daily (to be performed by BP or its contractor administrator, Fluor Global Services);

    3. Timesheets entered into Atrack (to be performed by the contractors);

    4. Contractor submits timesheets to CTS for validation of work order and contract number (to be performed by contractor);

    5. If the timesheet is validated the Atrack timesheet is printed (to be performed by contractor); and

    6. The Atrack timesheet is signed by BP job rep (to be performed by BP).

(Further steps are not relevant to this discussion.) This flow chart reveals two important facts: 1. The flow chart describes a "timesheet" in Step 2 differently than it describes an "Atrack timesheet" in Step 5; and 2. An "Atrack timesheet" could not be approved in Step 2 if the "Atrack timesheet" *is not even printed until Step 5*. Therefore, according to the invoice process flow chart constructed by BP's own in-house auditor, BP could not have meant that the "timesheet" that needed to be submitted to BP on a daily basis (Step 2) was an "Atrack timesheet" (not printed until Step 5). Further, after review of Ms. Donnelly's flow chart, no BP Texas City management ever told IMC that the "IMC timesheets" should not be used in Step 2 or were not acceptable for compliance with the invoicing procedures in the Contract.

    Mr. Luster, the BP Tank Maintenance Turn-Around Coordinator, was asked in his deposition whether BP ever had a problem receiving timesheets. He testified that there had been a problem with IMC turning in timesheets (those in Step 2), but once he spoke to IMC's David Atchley in 2002, IMC turned in the timesheets on time except for a few (less than 10) occasions:

    Q.    [MR. SORRELS] When do you first think there was a problem with them not turning in their time sheets?

    A.    When my job reps approached me and said that they had not been getting daily time sheets. So I called David Atchley and said we need to make sure we turn time sheets in.

Q. What time sheets are you talking about?

A. The time sheets that they did for the work for that day.

Q. Okay. Did you understand anything about the Atrack system or the CTS system?

A. Not the Atrack. I understand a little bit about the CTS.

Q. When you were talking about turning in daily time sheets, are you talking about the CTS time sheets or the -- or the IMC time sheets?

A. The IMC time sheets.

Q. All right. So, at some point during this contract, your job reps came to you and said, "Listen, we're not getting the IMC time sheets on a regular basis"?

A. That's correct.

Q. You called David Atchley?

A. Uh-huh.

Q. Is that yes?

A. Yes.

Q. And after that call, did they start turning in their time sheets?

A. Yes.

Q. And that would have been about the middle of the contract or somewhere in 2002?

A. That's correct.

\* \* \*

Q. …So, on these time sheets, these IMC time sheets, they ultimately, after this conversation with Mr. Atchley in 2002, were submitted then to your job reps on a daily basis?

9

A. After we -- after I told them we had a problem, they started submitting time sheets, yes.

\* \* \*

Q. Okay. Did you ever see IMC time sheets reported to -- sent in to you months later?

A. No, I did not.

Q. Okay. If the IMC folks testify that they turned in these IMC time sheets on a daily basis, do you have any reason to disbelieve that?

A. I don't know.

\* \* \*

Q. After 2002 and this conversation with Mr. Atchley, no job rep reported to you that IMC was not turning in their time sheets on a daily basis; is that true?

A. That is not true.

Q. Okay. What -- what job rep reported to you they weren't turning in their time sheet on a daily basis?

A. Bill Brown, Jerry Upchurch.

\* \* \*

A. …It got better, the time sheets got better; but then there were still some -- a time sheet may come up and it's dated back three or four months.

Q. Okay. How often would that happen?

A. It happened -- I don't know the number of times, but it was more than one. It was --

Q. Less than ten?

A. Less than ten.

> Q.   Okay. **So, in about the year and a half or so that they were on the job after this initial conversation with David Atchley, you had less than ten times where someone didn't turn in their time sheet**?
>
> A.   **I don't know the exact number, but it was several occasions, yes**.
>
> Q.   Okay. **It certainly wasn't an epidemic situation after you had this conversation with Mr. Atchley, correct**?
>
> A.   **No, no**.
>
>          \*   \*   \*
>
> Q.   All right. **Now, did you ever indicate to David Atchley in this conversation that you were not going to pay -- you, BP, was not going to pay IMC for their time if they didn't turn in their daily time sheets**?
>
> A.   **No**.

(Emphasis added) (Luster Depo., pp. 39-44, 47, Motion **Exh. "B"**).

If there was any problem with timesheets, whether the IMC timesheets turned in daily (Step 2) or the Atrack timesheets which were printed later (Step 5) and which accompanied the invoices, BP could have, and should have, alerted IMC to its "non-compliance" at that time. BP did not do so, and instead it paid millions of dollars worth of invoices that it was "excused" (using Mr. Costagliola's terminology) from paying. Therefore, BP ratified this procedure being used by IMC and/or it waived its right to complain about the procedure.

Also, since BP was aware of IMC's practice of submitting the IMC timesheets to BP for approval on a daily basis (Step 2), as opposed to submitting Atrack timesheets at that stage, BP accepted that practice and it never complained or objected one time about the practice from January of 2001 through most of 2003.[2] Many of the IMC timesheets turned in at the Step 2

---

[2] Even if BP originally expected its Atrack timesheets within a day of the work being performed, a modification of the contract occurred when the IMC timesheets were being used on a regular basis for this purpose because BP: (1)

11

stage were signed by the BP job representatives and returned to IMC. As far as IMC knew, the Atrack timesheets were not expected within one day of the work being performed, but were only required as backup when the invoices were submitted. IMC always included Atrack timesheets with the Atrack invoices and the timesheets were almost always signed by the various BP job representatives.[3] No one at BP ever notified anyone at IMC at any time before September of 2003, either in writing or verbally, that the Atrack timesheets were *the* "timesheets" that BP expected to be submitted within one working day of the work that was performed.

### E.   BP'S TIMESHEET CLAIM IN THIS CASE

In connection with other issues that arose and were investigated during the summer of 2003, BP sent a demand letter on October 1, 2003 to IMC seeking reimbursement for $1,964,483.01. At the time of the demand letter, BP owed IMC in excess of $2,000,000. The letter listed 12 line-item categories of "damages," but did not explain the basis for any of the "damages." None of the "damages" were for untimely submission of timesheets, although BP stated in the letter that "timesheets were out of compliance with contractual provisions for timely submittal. In date variance analysis conducted on the timesheets' effective date and the system entry time, over 95% of IMC's timesheets were subject to the contract provisions for payment delay or refusal." (BP Demand Letter, IMC 34526, Motion **Exh. "H"**). BP did not provide its date variance analysis.

---

had notice of the change; and (2) accepted the change without objection. *See* S.K. Apparel Mfg., Inc. v. The City of Houston, 2002 WL 1822406 at *2 (Tex.App.-Hous. (14 Dist.)) (*citing* Price Pfister, Inc. v. Moore & Kimmey, Inc., 48 SW 3d 341, 349-50 (Tex.App.-Hous. (14 Dist.) 2001, pet. denied.).

[3] The documents establish that **virtually all of the Atrack timesheets**, with very few exceptions, that served as backup to the outstanding invoices in dispute in this case **were signed by BP job representatives**.

After two meetings in October where IMC failed to get a satisfactory explanation from BP as to the basis of its damage claims, and because of BP's continued refusal to pay any of the outstanding invoices, IMC left the job site.

BP filed this suit on November 12, 2003. IMC immediately counter-claimed for its unpaid invoices. The first time BP ever quantified a "timesheet claim" was in Mr. Costagliola's October 19, 2004 report. (Costagliola Report, first line item in chart at p. 14, together with fn. 36, and pp. 15-17, **M. Exh. "1"**).

## IV. ARGUMENT AND AUTHORITIES

Federal Rules of Evidence 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience in his discipline." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1174 (1999) (quoting from the court's opinion in Daubert, 509 U.S. at 592, 113 S.Ct. at 2796). The district court must make a preliminary determination whether the proposed expert witness is qualified and "should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999). Mr. Costagliola is not qualified to offer the opinion which he seeks to offer in Opinion C.1. His opinion amounts to nothing more than a legal interpretation of the Invoicing Procedures section of the Refinery Contract that is impermissible.

IMC complied with the invoicing procedures set forth in the contract, or, at a minimum, those procedures were modified and/or ratified by the conduct and practice being followed by IMC which was completely known and acceptable to BP. IMC generally submitted the IMC

13

timesheets by the end of the next business day to the BP job representatives. This fully complied with *Paragraph Three* (quoted at page 3 of this Memorandum). There is no requirement in *Paragraph Three* that the timesheets referred to be signed by the BP job representatives, although they often did sign them. If this deadline was missed, no complaints were ever made to IMC by any of the BP job representatives. IMC also generated Atrack timesheets and obtained the necessary signatures of the BP job representatives. The Atrack timesheets were submitted as required with the Atrack invoices. This fully complied with *Paragraph Two* (quoted at page 3 of this Memorandum).

      Mr. Costagliola testified in his deposition that he believes himself to be an expert in the area of contract administration and in the legal interpretation of contracts. (Costagliola Depo., pp. 13-14, 18., Motion **M. Exh. "3"**). He also testified that he reviewed all three contracts (i.e. the Refinery Contract, the Chemical Contract, and the Dome Contract). (Costagliola Depo., pp. 14, 17-18, Motion **M. Exh. "3"**). Of the three, the only one which he testified has a "timely submission" requirement is the Refinery Contract (Costagliola Depo., pp. 25-26, Motion **M. Exh. "3"**).

      Mr. Costagliola admitted that IMC reported its labor on separate BP time sheets per Schedule 9700, as required by *Paragraph One* (quoted at page 3 of this Memorandum). (Costagliola Depo., p. 35, Motion **M. Exh. "1"**). The pertinent part of the Refinery Contract that he believes IMC did not comply with appears in *Paragraph Three* (quoted at page 3 of this Memorandum). Both *Paragraphs Two* and *Three* are quoted again here for ease of reference:

    "INVOICING PROCEDURES:

    *[Paragraph Two:]*

> Contractor shall submit daily time sheets to Company's Job Representatives for verification and signature and shall include a copy of signed time sheets, as well as material back-ups, with his invoice.

*[Paragraph Three:]*

"The contractor will be responsible for reporting and submitting timesheets for Company approval before the close of the next work day after work has been performed.  Company reserves the right to delay or refuse payment on any timesheets that have been submitted after the close of the next work day."

As to *Paragraph Two*, Mr. Costagliola testified that the "daily time sheets" referred to is a time sheet generated from BP's CTS (Atrack) system:

> Q. [MR. SORRELS] Let me read that sentence to you and into the record. "Contractor shall submit daily time sheets to companies' [*sic--Company's*] job representatives for verification and signature and shall include a copy of signed time sheets as well as material backups with his invoice."
>
> \* \* \*
>
> Q. Now this paragraph says, "Daily [*sic – daily*] time sheets are to be submitted."  What is a daily time sheet?
>
> A. It is a time sheet that is generated from the CTS [Atrack] system.
>
> \* \* \*
>
> Q. …Is there anything in this paragraph that discusses when the daily time sheet, which you call the Atrack time sheet or CTS time sheet, should be submitted?
>
> \* \* \*
>
> A. Timing is not involved in that paragraph.
>
> Q. But it's your opinion that daily time sheets mean CTS time sheets, correct?
>
> A. Yes.

15

(Costagliola Depo., pp. 38-39, Motion **M. Exh. "3"**).  IMC fully complied with *Paragraph Two* by submitting signed Atrack timesheets with the Atrack invoices.

As to *Paragraph Three*, Mr. Costagliola opines that the "timesheets" referred to are "Atrack timesheets." He clings to this opinion despite the fact that in drafting the contract, BP used three different terms to define "timesheets." BP used term "Company time sheets" in *Paragraph One*, "daily time sheets" in *Paragraph Two* and "timesheets" in *Paragraph Three*. Mr. Costagliola responded to questions about *Paragraph Three*:

> Q. [MR. SORRELS] …The next paragraph says "The contractor will be responsible for reporting and submitting time sheets *[sic -- timesheets]* for company approval before the close of the next workday after the work has been performed."
> Did I read that sentence correctly?
>
> A. Yes.
>
> \* \* \*
>
> Q. **It doesn't say company time sheets, does it**?
>
> \* \* \*
>
> A. **Time sheets are company time sheets as represented in the contract**.
>
> Q. Are the words and wording of a contract important in understanding the interpretation of the contract?
>
> A. Yes.  And so is the format and form.
>
> \* \* \*
>
> Q. …What do you mean "format and form"?
>
> A. Where is it located in the contract and under what paragraph and under what heading.

16

> Q. All right. **Does the word "company time sheets" appear together in this paragraph we're talking about**?
>
> A. **Not in this paragraph**.
>
>           \*   \*   \*
>
> Q. **…Now, tell me your opinion as to which time sheets were to be submitted for approval before the close of the next workday**.
>
> A. **In my opinion there's no question. It is company time sheets**.
>
> Q. **Company time sheets, again, means CTS time sheets**?
>
> A. **Yes, sir**.

(Emphasis added) (Costagliola Depo., pp. 43-47, Motion **M. Exh. "3"**). Thus, according to Mr. Costagliola, only "Atrack timesheets" can satisfy *Paragraph Three*.

Mr. Costagliola's opinion totally disregards that there was a practice being carried on by IMC of submitting the IMC timesheets to the BP job representatives within a day of the work having been performed. As noted above, it would have been impossible for IMC to have an "Atrack timesheet" approved by the BP job rep (Step 2) if the "Atrack timesheet" was not even printed until Step 5. **Mr. Costagliola's opinion is based upon an unsupported subjective opinion about what he wants the contract to be interpreted to mean. His opinion, a legal interpretation, is unreasonable and he is not qualified to give the opinion.**

Mr. Costagliola answered in his deposition that the contract is not ambiguous:

> Q. [MR. SORRELS] Now let's talk about Exhibit No. 6 first, the refinery contract. Do you believe that that contract has any terms that are ambiguous?
>
> A. Have any terms at all that are ambiguous?

17

> Q. When I talk about "any of the terms," any of the terms that you've discussed in your report.
>
> A. No. I think the terms are fairly straightforward.
>
> Q. So it's your opinion that the terms of Exhibit 6, the areas that we've talked about, are unambiguous. Is that correct?
>
> A. I believe it takes some careful reading, but I don't believe there's ambiguity.

(Costagliola Depo., p. 21, Motion **M. Exh. "3"**). His testimony was the same for the Chemical and Dome contracts. (Costagliola Depo., pp. 21-23, Motion **M. Exh. "3"**).

"Contract interpretation is a matter of law for the court to decide." Cunningham v. Bienfang, 2002 WL 31553976 at *2 (N.D.Tex. 2002) (quoting *Amica Mutual Ins. Comp. V. Moak*, 55 F.3d 1093, 1096 n.5 (5th Cir.1995)). "Absent any need to clarify or define terms of art, science, or trace, expert opinion testimony to interpret contract language is inadmissible." Koch v. Koch Industries, Inc., 2 F.Supp. 2d 1385, 1400 n.3 (D.Kan. 1998) (quoting *North American Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1281) (6th Cir.1997)). "Although '[g]enerally, an expert should be allowed to explain the meaning of technical terms contained within technical documents,' expert witness testimony introduced to address '[t]he expression of [a] witness' subjective intent' when entering into a document is 'properly ruled out by the court.'" Aerotech Resources, Inc. v. Dodson Aviation, Inc., 2001 WL 474296 at *2 (D.Kan. 2001)). *See* also, Coregis Ins. Co. v. Bell, 1999 WL 244097 (E.D.La. 1999) (wherein the court held that: "expert opinion testimony to interpret the contract language 'might be expected', which is *not* a term of art, science, or trade, is inadmissible.")

In a recent case where a party attempted to offer an expert on the interpretation of the provisions of a contract, this Court held "[These] are not proper expert opinions; these opinions

do not represent conclusions based on technical or specialized knowledge. They are, instead, parol evidence offered on factual matters. These opinions invade the Court's province to interpret the parties' contracts as a matter of law." <u>Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,</u> 264 F.Supp.2d 490, 495 n.4 (S.D.Tex. 2003). (Atlas, J.)

## CONCLUSION

IMC requests that this Court exclude Mr. Costagliola as an expert witness from offering his Opinion C.1 because it is an impermissible legal interpretation of the contract in violation of <u>Kumho Tire</u> and <u>Daubert</u>.

        Respectfully submitted,

        **ABRAHAM, WATKINS, NICHOLS,**
        **SORRELS, MATTHEWS & FRIEND**


By: _____/S/_____
       Randall O. Sorrels
       Attorney-In-Charge
       Federal No. 11115
       State Bar No. 18855350
       800 Commerce Street
       Houston, TX 77002
       713/ 222-7211
       713/ 225-0827 fax


Of Counsel:

**ABRAHAM WATKINS NICHOLS**
**SORRELS MATTHEWS & FRIEND**

Robert J. Kruckemeyer

Thomas E. Balhoff

**ROEDEL PARSONS KOCH BLACHE**
**BALHOFF & MCCOLLISTER**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on all counsel of record on this ___15th____ day of March, 2005, by certified mail, return receipt requested, facsimile transmission or hand delivery.

___/S/_____
Randall O. Sorrels